

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-17-2007

# USA v. Strickland

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3777

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Strickland" (2007). *2007 Decisions.* Paper 758.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/758

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-3777

———————

UNITED STATES OF AMERICA,

v.

RODERICK STRICKLAND,

Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 04-239)
District Judge: Hon. Petrese B. Tucker

———————

Argued May 8, 2007

Before: RENDELL and JORDAN, <u>Circuit Judges</u>,
and VANASKIE[*], <u>District Judge</u>

(Filed: July 17, 2007)

———————

[*]The Honorable Thomas I. Vanaskie, United States District Judge for the Middle
District of Pennsylvania, sitting by designation.

Robert Epstein
Defender Association of Philadelphia
Federal Court Division
601 Walnut Street
Curtis Center, Suite 540 West
Philadelphia, PA   19106

Samuel J.B. Angell    **[ARGUED]**
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
601 Walnut Street
Curtis Center, Suite 540 West
Philadelphia, PA   19106

*Counsel for Appellant*
*Roderick Strickland*


Julie M. Hess
Office of United States Attorney
615 Chestnut Street
Philadelphia, PA   19106

Mary A. Futcher     **[ARGUED]**
Office of United States Attorney
504 West Hamilton Street, Suite 3701
Allentown, PA   17901

*Counsel for Appellee*
*United States of America*

---

OPINION

---

VANASKIE, <u>District Judge</u>.

Defendant Roderick Strickland was arrested by officers of the Chester County, Pennsylvania Adult Probation and Parole Department on August 13, 2002, for violating the terms of his parole.  Eight months later, while Strickland was still in custody but before his parole was revoked, parole officers conducted a warrantless search of Strickland's residence and discovered multiple firearms and ammunition.  In November of 2003, Strickland admitted that the weapons and ammunition found at his home constituted a parole violation, and the state court revoked his parole.  Strickland was then indicted by a federal grand jury on charges of being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1).  Strickland's motion to suppress the evidence seized as a result of the warrantless search was summarily denied by the District Court.  Strickland subsequently pled guilty, and received a sentence of 63 months imprisonment.  As authorized by his conditional plea agreement,  Strickland has appealed the District Court's order denying his motion to suppress.  Because we conclude that the state parole agents had reasonable suspicion to conduct the search, we will affirm.

**I.**

On December 20, 2000, Strickland was sentenced by the Court of Common Pleas for Chester County to a prison term of 3 to 23 months imprisonment plus probation of one year on charges of simple assault and terroristic threats.  He was paroled on the same date, and came under the supervision of the Chester County Adult Probation and Parole

Department.

On August 13, 2002, Chester County Probation and Parole Officer Michelle Miller filed a petition to issue a bench warrant, schedule a hearing, and find probation/parole violations based on Strickland's alleged failure to comply with the terms of his parole. The petition did not claim that Strickland possessed firearms at his home, though it alleged, among other violations, that Strickland was discharged from a domestic violence program "due to being in possession of a weapon."[1] Appendix ("App.") 187. The petition was granted and a bench warrant was issued.

On August 16, 2002, Chester County warrant enforcement officers entered Strickland's residence, which he shared with his father, to execute the bench warrant. While searching for Strickland, the officers spotted "what appeared to be a locked gun cabinet, machine gun shells, military paraphernalia, [and] some military dolls." App. 81. Neither Strickland nor his father were present at the residence. Later that day, Strickland was taken into custody at his girlfriend's apartment. He has remained in custody ever since.

At the time of Strickland's arrest, the Chester County Probation and Parole Department, an unarmed agency, had suspended searches while its officers received additional training. In October of 2002, however, while searches by the Department were still suspended, Officer Miller informed the state trial judge who was assigned to

_____

[1] The weapon was a lockblade knife.

4

Strickland's case that there was reason to suspect that weapons were in Strickland's residence and that the Department wanted to conduct a search of it before Strickland was released.

On January 27, 2003, Officer Miller was notified by the Chester County District Attorney's Office that Strickland's girlfriend, Rosie Jiminez, had reported that Strickland kept a shotgun wrapped in a trash bag underneath a dresser at his residence and an AK-47 rifle on a shelf in his basement. The record does not specify when or how Jiminez obtained the information. Jiminez also turned in a loaded handgun that she said belonged to Strickland. Two days later, Jiminez gave the Chester County District Attorney's office a letter written by Strickland while he was in prison asking her to purchase an AR-15 assault rifle for him.

On April 14, 2003, nearly eight months after Strickland was arrested, Officer Miller sought permission from her supervisor, Richard Marinari, to search Strickland's residence "to ensure compliance with his parole."[2] App. 194. Marinari, in turn, requested approval from the Department's Deputy Director, which was granted.

Chester County probation and parole officers conducted a search of Strickland's

---

[2] Under Pennsylvania law, a county probation and parole officer is authorized to conduct searches based upon reasonable suspicion that contraband or other evidence of violations of conditions of supervision may be found. 61 Pa. Cons. Stat. Ann. § 331.27b(d)(2). Absent exigent circumstances, however, the officer must obtain approval of a supervisor before conducting the search. § 331.27b(d)(3). Officer Miller presented all the information set forth above to her supervisor.

residence on April 15, and 16, 2003. The officers discovered multiple firearms, including a shotgun and an AK-47 rifle in the locations described by Jiminez, and ammunition. The pending state court petition to revoke parole was then amended to include possession of the contraband found at the residence.

During a parole revocation hearing conducted on November 20, 2003, Strickland admitted he owned the firearms seized at his residence. Strickland was found to have violated the terms of his state parole, parole was revoked, and he was sentenced to the balance of his prison sentence. He was ordered to be re-paroled effective December 16, 2003, with a condition that his residence be searched again prior to his release.

On April 27, 2004, a grand jury in the Eastern District of Pennsylvania charged Strickland with two counts of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g). The first count was related to the firearms and ammunition found at Strickland's residence, while the second count was connected to the loaded handgun Jiminez had provided to the District Attorney's Office.[3]

Strickland moved to suppress the physical evidence recovered from his residence, arguing, *inter alia*, that the parole officers lacked reasonable suspicion to conduct a warrantless search. The District Court conducted a hearing on the motion on July 20, 2004, at which Officers Miller and Marinari testified. After hearing argument from

---

[3] Strickland's father was indicted separately on charges that he had procured a firearm for his son. He eventually entered a guilty plea. United States v. Strickland, Crim. No. 04-831 (E.D. Pa. Dec. 30, 2004).

6

counsel and considering the evidence set forth above, the District Judge denied

Strickland's suppression motion.

Pursuant to a plea agreement, Strickland pled guilty to both counts of being a felon

in possession of a firearm and ammunition. In his plea agreement, Strickland preserved

the right to appeal the District Court's denial of his suppression motion. The District

Court entered judgment on August 3, 2005. This appeal followed.

## II.

We exercise appellate jurisdiction under 28 U.S.C. § 1291. In reviewing a district

court's denial of a motion to suppress, we review the underlying factual findings for clear

error and exercise plenary review over the district court's application of the law to those

facts. United States v. Lockett, 406 F.3d 207, 211 (3d Cir. 2005).

## A.

In Griffin v. Wisconsin, 483 U.S. 868, 873-75 (1987), the Supreme Court found

that the "special need" of a state's probation system to supervise a probationer permitted a

state to empower a probation officer to conduct a warrantless search of the probationer's

home on a standard below probable cause.[4] In reaching its conclusion, the Court stressed

---

[4] Griffin involved a search by a probation officer to investigate whether a probationer
was in violation of his probation restrictions. Griffin, 483 U.S. at 873-80. In United
States v. Knights, 534 U.S. 112, 122 (2001), the Supreme Court approved a warrantless
search of a probationer's home by a sheriff's deputy when the deputy suspected the
probationer was engaging in criminal activity and the probationer consented to a search
provision as a condition of his probation. The Knights Court emphasized that the
probation search condition was a "salient circumstance" for its conclusion. Id. at 118.

7

that a warrant requirement would interfere with the probation system by delaying investigations into suspected violations and effectively establishing a magistrate, rather than a probation officer, as the probationer's supervisor.  Id. at 876.

The Court also concluded that a probable cause requirement would unduly disrupt the probation regime by restricting a probation officer's ability to supervise a probationer. Id. at 878-79 (observing that "it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts").  The Court found this to be especially necessary in situations involving drugs or illegal weapons due to the risks they pose to the probationer and society.  Id. at 879.

Relying on Griffin, we have determined that Pennsylvania may empower a parole officer to conduct a warrantless search of a parolee's property based on reasonable suspicion that the parolee has violated a condition of parole.  United States v. Baker, 221 F.3d 438, 443-45 (3d Cir. 2000); United States v. Hill, 967 F.2d 902, 907-11 (3d Cir. 1992).  We have also concluded that a warrantless search is proper even after the parolee

Though Appellee suggests that Strickland agreed to a search provision as a condition of his parole, (Appellee's Br. at 18 n.4), the record does not contain the agreement. Strickland, for his part, does not address whether he agreed to a search provision. Because we find that the parole officers had reasonable suspicion to conduct a warrantless search of Strickland's residence under Griffin, we need not resolve whether Knights also applies to this case.

8

is in custody.  Hill, 967 at 910-11.[5]

This case does not present the question of the precise parameters of the special needs justification for a warrantless search of a parolee's residence.  Nor does it present a challenge to the Pennsylvania statute authorizing county probation and parole officers to conduct searches of parolees' real property based upon reasonable suspicion.  See 61 Pa. Cons. Stat. Ann. § 331.27b(d)(2).   Instead, Strickland questions whether the evidence that he possessed firearms at his residence was too stale to supply the requisite reasonable suspicion for a warrantless search otherwise authorized by Pennsylvania law.[6]

**B.**

Pennsylvania authorizes county parole officers to conduct a warrantless search of a parolee's property "if there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision."  61 Pa. Cons. Stat. Ann.

---

[5]Other Courts of Appeals are in agreement that the incarceration of the parolee does not impose upon parole authorities the need to procure a warrant before conducting a search to obtain evidence of violations of conditions of supervision.  See, e.g., United States v. Trujillo, 404 F.3d 1238, 1243-44 (10th Cir. 2005); United States v. Jones, 152 F.3d 680, 684-87 (7th Cir. 1998); Latta v. Fitzharris, 521 F.2d 246, 252 (9th Cir. 1975).

[6]In passing, Strickland concluded in his brief that the justifications for a warrantless search in Griffin are lacking in this case.  (Appellant's Br. at 15-16.)  Appellant, though, did not pursue this argument before the panel, conceding that the reasonable suspicion standard should apply.  Because Appellant failed to adequately raise the issue, it will be deemed waived.  See Commonwealth of Pa. v. HHS, 101 F.3d 939, 945 (3d Cir. 1996) (arguments briefly mentioned in conclusory manner are deemed waived); Simmons v. City of Phila., 947 F.2d 1042, 1066 (3d Cir. 1991) ("[A] passing reference to an issue in a brief will not suffice to bring that issue before this court on appeal.").

§ 331.27b(d)(2). In deciding whether reasonable suspicion exists, "we consider the totality of the circumstances to determine whether the 'officer has a particularized and objective basis for suspecting legal wrongdoing.'" United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). Furthermore, a parole officer's decision to search a parolee's home "must be based on 'specific facts.'" Baker, 221 F.3d at 444.

The parole officers had a particularized basis for suspecting that Strickland possessed firearms and ammunition at his residence. While attempting to execute a bench warrant for Strickland, warrant enforcement officers observed ammunition and what appeared to be a gun cabinet in Strickland's residence. This information was corroborated by Strickland's girlfriend, who provided specific details about the types of firearms stored at Strickland's residence and where they were located. She also proved to be a reliable source when she turned over a loaded handgun belonging to Strickland and a letter by Strickland asking her to purchase an assault rifle. Considering all this information, the parole officers possessed reasonable suspicion that Strickland kept firearms at his residence in violation of the terms of his parole.

Strickland complains that the information regarding firearms at his residence was too stale by the time the parole officers conducted the search to satisfy the reasonable suspicion standard. Though a court should consider the age of information in determining whether there is adequate suspicion justifying a search, the court must ultimately

10

determine whether the evidence is likely to be still found at the searched property. United

States v. Zimmerman, 277 F.3d 426, 434 (3d Cir. 2002). "'The likelihood that the

evidence sought is still at the place to be searched depends on a number of variables, such

as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be

searched.'" United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997) (quoting United

States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir.1983)).

In this case, Strickland was arrested the same day the warrant enforcement officers

observed ammunition and what appeared to be a gun cabinet. He remained in custody

through the search of his residence. The contraband in question (guns and ammunition)

was not perishable. Moreover, the place to be searched, Strickland's residence, is

recognized as a likely location of firearms. See United States v. Jones, 994 F.2d 1051,

1056 (3d Cir. 1993) (observing that firearms are likely to be stored at a residence).

Consequently, there was no reason for the parole officers to believe that the gun cabinet

and ammunition were removed from the residence.[7] See United States v. Gettel, 474 F.3d

---

[7] Of course, Strickland shared his residence with his father, who had an opportunity to remove the firearms from the property. The parole officers, though, did not know that Strickland's father had a role in acquiring some of the firearms for his son, and so did not suspect he had a motive to dispose of them. At the time of the search, the parole officers simply believed Strickland kept firearms at the house and had no opportunity to dispose of them. The parole officers also had information that Strickland was then trying, through a request to Jiminez, to obtain an additional firearm, which further indicated that Strickland was interested in getting firearms rather than disposing of them. Based on this analysis, we hold that the officers reasonably suspected the firearms were still present at the residence when they conducted their search.

1081, 1086 (8th Cir. 2007) (finding two-month-old evidence that defendant possessed stolen property at his residence was not stale because defendant had little time to dispose of the evidence as he had been incarcerated for a substantial portion of the time between the theft and the search); United States v. Anderson, 924 F. Supp. 286, 291 (D.D.C. 1996) (finding 28-day-old evidence related to gun possession at an apartment used by the defendant was not stale because the defendant was incarcerated and did not have an opportunity to remove the evidence).

Similarly, there is no indication that the firearms reported by Strickland's girlfriend were removed from the house. The suspected wrongful conduct, possession of weapons, is by its nature a continuous activity. See United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1997). Indeed, that Jiminez was holding a handgun for Strickland and he was trying to have her purchase a weapon for him indicates that Strickland was engaged in a "continuing offense" of gathering firearms. See Zimmerman, 277 F.3d at 434 (suggesting that adequate suspicion may be based on dated information if there is evidence of a continuous effort to obtain contraband). We therefore conclude that the information, taken collectively, was not so dated as to eliminate the parole officers' reasonable suspicion that firearms were present in Strickland's residence.

## III.

For the foregoing reasons, we will affirm the District Court's denial of Strickland's motion to suppress.

RENDELL, *Circuit Judge*, concurring.

I concur with the majority's holding that there was reasonable suspicion to support the search in question. On appeal before us, Strickland has abandoned the argument that a warrant should have been obtained, perhaps believing that *Griffin* sealed his fate in that regard, given the existence of a Pennsylvania law for parolees similar to the one that the *Griffin* Court upheld as constitutional. Strickland confines his argument to the issue of whether reasonable suspicion was present, and because I agree with the majority's view that it was, I agree with its disposition of this appeal. I write separately, however, to urge that there are gaps in our Fourth Amendment parole/probation jurisprudence regarding special needs searches that need to be filled in the appropriate case.

I.

The Supreme Court jurisprudence in the area of probationer and parolee searches has involved specific factual settings, none of which fits precisely with the fact pattern here. In *Griffin*, the Court considered the constitutionality of a search undertaken pursuant to Wisconsin's regulation which authorized warrantless searches of probationers on the basis of reasonable suspicion. The Court in *Griffin* upheld the search regime as well as the search undeniably undertaken for the special need for which the regime was created: supervision of the probationer population. We have a similar regulation in Pennsylvania, and there has been no challenge to its constitutionality. But the purpose of the search is subject to question, as is whether the special needs justification is applicable

13

when the search is undertaken eight months after incarceration and the aims of parolee rehabilitation and supervision are far more attenuated.

In *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court addressed the propriety of an investigatory search of a probationer by a police officer, and concluded that a search without a warrant and based on reasonable suspicion was reasonable under the Fourth Amendment, based on a balancing of the state's interests and the probationer's diminished expectation of privacy. That diminished expectation of privacy was due in large part to a condition of probation permitting suspicionless searches. *Id*. at 119-20. In Strickland's case, we have no evidence that such a condition was imposed and, in any case, Pennsylvania law requires that parole searches be based on reasonable suspicion.

Our opinion in *Hill* relied on the special needs justification, and properly so, because it involved a search conducted the day after the parolee's arrest and was clearly aimed at fulfilling the needs of the parole system. Again, that fact pattern differs from the eight-month delay we have before us. In the instant case, as the majority notes, we are not presented with a challenge to the parameters of the special needs justification for warrantless searches of parolees' residences. Under *Griffin*, the search at issue here presumably should be viewed as constitutional because it was conducted "pursuant to" the authority of the Pennsylvania regulation. But I question whether the Court in *Griffin* intended that a search of a home of a parolee who is incarcerated and not under active supervision, a search that is conducted eight months after the parolee was apprehended

14

and conducted without any urgency, nonetheless qualifies as a special needs search,[8] even if carried out under the aegis of a constitutional regulation.[9]

In *Griffin*, there was no question that the search was aimed at fulfilling Wisconsin's special needs; the defendant was out on probation when the probation office received a tip from police that there might be guns in Griffin's apartment. Probation officers came to Griffin's home accompanied by three plainclothes police officers, found him there, and informed him that they were going to search the home. The search, "carried out entirely by the probation officers under the authority of Wisconsin's probation regulation," *Griffin*, 483 U.S. at 871, uncovered a handgun. In determining whether a warrant was required, the *Griffin* Court noted that time concerns were a key

---

[8] The baseline requirement for searches of a home is a warrant. The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment "ordinarily prohibit[s] the warrantless entry of a person's house as unreasonable *per se*," *Georgia v. Randolph*, 126 S. Ct. 1515, 1520 (2006), and the home is where Fourth Amendment interests are at their apex. *See Payton v. New York*, 445 U.S. 573, 589 (1980) ("The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . .").

[9] *Griffin* seems to have left open only the question as to a search not pursuant to such a regulation. *See Griffin*, 483 U.S. at 880 ("The search of Griffin's residence was 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers. This conclusion makes it unnecessary to consider whether . . . *any* search of a probationer's home by a probation officer is lawful when there are 'reasonable grounds' to believe contraband is present.").

reason why warrants were impracticable for searches of probationers. "A warrant requirement would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires. Moreover, the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct, and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create." *Id.* at 876 (citation omitted).

For the same reasons, the *Griffin* Court found that probationer searches need not be based on probable cause. "We think that the probation regime would also be unduly disrupted by a requirement of probable cause." *Id*. at 878. "In some cases -- especially those involving drugs or illegal weapons -- the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society." *Id.* at 879.

In short, *Griffin* involved a special needs search necessarily implicating concerns beyond normal law enforcement objectives, and the *Griffin* Court emphasized two interests behind the need for close supervision of probationers: rehabilitation of the probationer and protection of the community. Additionally, the Court found that the warrant and probable cause requirements could cause delays in monitoring probationers, and interfere with the type of speed needed for meaningful supervision of a probationer.

The line between normal law enforcement searches and special needs searches

16

becomes very fine when parole and probation are involved,[10] and thus additional care is required in how courts approach such searches. Supervision of parolees in the community is a special need, but given the slippery slope between special needs and typical law enforcement searches–of homes, no less–in the context of probation and parole, extra caution is needed when a search is undertaken eight months after the arrest, and while the parolee is incarcerated.

The rationales supporting a warrantless search in *Griffin* are wholly inapplicable here, where Strickland *had been incarcerated for eight months at the time of the search*. Strickland was not at his home when the search took place, he was in a county prison cell. Under *Griffin*, probationary status and the attendant state interests alter the Fourth Amendment warrant requirement, but the reason for doing so is that the government has a

---

[10]Indeed, the parole system relies on its close relationship with the criminal justice system for its success; it encourages rehabilitation with revocation of parole and criminal punishment as unmistakable consequences of noncompliance. "The enforcement leverage that supports the parole conditions derives from the authority to return the parolee to prison to serve out the balance of his sentence if he fails to abide by the rules." *Morrissey v. Brewer*, 408 U.S. 471, 478-79 (1972). Accordingly, the line between ordinary law enforcement interests and the state interests beyond them is blurred in the context of probation and parole; certain searches may indeed be aimed at rehabilitation, but others may not. *See* Steven J. Schulhofer, *On the Fourth Amendment Rights of the Law-Abiding Public*, 1989 SUP. CT. REV. 87, 118 (describing as a "meaningless inquiry" the question of "whether probation supervision constitutes mere 'regulation' or 'ordinary law enforcement'"); Note, Antoine McNamara, *The "Special Needs" of Prison, Probation, and Parole*, 82 N.Y.U. L. REV. 209, 245 n.235 (2007) ("[T]he doctrinal distinction between law enforcement and non-law enforcement needs is somewhat tenuous. This is especially true when applied to government supervision of individuals on parole or probation.") (citation omitted).

17

special need in supervising the individual while he is out on probation. There was no suggestion in Strickland's case, as there was in *Griffin*, that evidence might have been destroyed but for the parole officer's ability to conduct a search unencumbered by the warrant requirement. There was no suggestion that the rationale for the search in Strickland's case was to supervise Strickland or, as Miller's report stated, to "ensure compliance with his parole," App. 38; Strickland most certainly had not complied, and Miller knew that. Nor could such rationales have justified the search because Strickland was already incarcerated. Indeed, with his revocation still to be held, one might posit that the purpose of the search was simply to obtain evidence.[11]

The purposes underlying this search appear to differ from those in *Griffin*. At best, the premise for the April search was to determine *to what extent* Strickland had violated his parole. But this government interest is different from the one approved by the Court in *Griffin*, when the search occurred while Griffin was in the home itself. Assessing *the extent* of a parole violation after the parolee is already in custody is a legitimate but less compelling interest than determining whether the parolee is complying with the conditions of his parole in the first place. Most importantly, when the search occurs eight months after the initial arrest, it cannot be considered a special need beyond normal law enforcement objectives. Indeed, it is essentially a simple search for evidence to use

---

[11]*Ferguson v. City of Charleston*, 532 U.S. 67, 83 n.20 (2001) ("In none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes.").

in enhancing the parolee's punishment.

Bottom line, I am constrained to read *Griffin* as authorizing a warrantless search such as this where a valid regulation is in place. However, if such a reading of *Griffin* is correct, I question the wisdom of its holding. Accordingly, in the appropriate case, I would re-examine whether *Griffin* and, concomitantly, the special needs justification, may be read so broadly as to legitimize all warrantless searches of a parolee conducted by a parole officer prior to a parole revocation hearing where specifically authorized by statute.